U.S. DISTRICT COURT - N.D. OF N.Y.

FILED

OCT 1 1 2024

AT_____ O'CLOCK
John M. Domurad, Clerk - Utica

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Michael and Dawn Carpenter<br><br>M. C., a minor<br><br>          *Plaintiffs.*<br><br><br>vs.<br><br><br>Board of Education for the Clinton Central<br><br>School District<br><br>Upstate Cerebral Palsy, Inc., doing business<br><br>as Upstate Caring Partners<br><br>          *Defendants.* | **Civil Case No.:** 6:24- CV-1250 (DNH/TWD)<br><br>**COMPLAINT PURSUANT TO THE**<br><br>**AMERICANS WITH DISABILITIES ACT**<br><br>**AND SECTION 504 OF THE**<br><br>**REHABILITATION ACT**<br><br><br><br>**Plaintiffs demand a trial by JURY** |

## INTRODUCTION

The Plaintiffs, Michael and Dawn Carpenter (the "Parents") and Michael Carpenter, on behalf of

M. C., allege that the Clinton Central School District (the "District") and Upstate Cerebral Palsy,

Inc. ("UCP"), intentionally discriminated against the plaintiffs and, through their discrimination,

fails to educate M. C. in an achievable integrated setting in violation the integration mandate

under Title II of the Americans with Disabilities Act of 1990 (the "ADA") and Section 504 of the

Rehabilitation Act ("Section 504"), and their implementing regulations. The Plaintiffs

furthermore allege that the Defendants interfered with and harrased Plaintiffs for exercising their

right to independent educational evaluations of M. C., as afforded by the Individuals with

Disabilities Education Act ("the IDEA"), and for advocating for M. C.'s right to be free from

being discriminated against, in violation of Title II of the ADA and Section 504.

When New York school districts remove students with disabilities from general-education

classrooms to provide necessary accommodations and services, they must do so in a way that

does not discriminate against the students and they must place them in the least restrictive setting

possible pursuant to the ADA requirements. When those requirements are not met and removals

are discriminatory, students and advocates can and should bring ADA Title II anti-discrimination

and Olmstead reintegration claims to secure placement back into a more integrated setting(s).

Indeed, in *United States v. Georgia*, the U.S. Department of Justice endorsed this concept,

alleging in its complaint that children in the state-wide GNETS program would be better served

by general education classrooms or other more integrated settings. In both *Georgia* and *Georgia*

*Advocacy*, the ADA discrimination claims survived motions to dismiss, indicating that removal

into such deficient educational settings can be shown to be discriminatory.

## JURISDICTION AND VENUE

1.  This Court has jurisdiction of this action pursuant Title II of the Americans with

Disabilities Act of 1990, 42 U.S.C. §§ 12131-12132, Section 504 of the Rehabilitation

Act, 29 U.S.C. §791 *et seq*, and 28 U.S.C. §§ 1331 and 1345. The Court may grant the relief

sought in this action pursuant to 28 U.S.C. § 2201 and 2202.

2.  Venue is proper in this district pursuant to 28 U.S.C. § 1391, since a substantial

part of the acts and omissions giving rise to this action occurred in the Northern District of New York. 28 U.S.C. § 1391(b).

## PARTIES

3.  Plaintiffs Michael and Dawn Carpenter are the parents and natural guardians of their son, M. C., and they reside in the Clinton Central School District. M. C. is an individual with a disability who is dually diagnosed by two independent, licensed psychologists as having Down Syndrome and Autism. The Parents' mailing address is PO BOX 87, Clark Mills, NY, 13321.

4.  Plaintiff Michael Carpenter acts on behalf of M. C. in this action not only as M. C.'s father but also as a *de facto* disability rights advocate by virtue of his own disability. His mailing address is PO BOX 87, Clark Mills, NY, 13321.

5.  Defendant Board of Education of the Clinton Central School District is a public school district with administrative offices located at 75 Chenango Avenue North, Clinton, NY 13323.

    i.   The District is a public entity within the meaning of the ADA and is, therefore, subject to title II of the ADA and its implementing regulations.

    ii.  As a recipient of federal funding, the Clinton Central School District is also subject to Section 504 of the Rehabilitation Act.

    iii. The district is also subject to the IDEA because the District receives some of its federal funding via the IDEA Part B Section 611 and Section 619 funds. Section 611 contains provisions relating to special education for school-aged children

with disabilities (ages 3 through 21) and Part B, Section 619 addresses the
supplemental state grants program for preschool children with disabilities (ages 3
through 5). The grant programs authorized under Part B of the IDEA provide
federal funding to states and local educational agencies (LEAs) for the provision
of special education and related services to children with disabilities.

6. Defendant Upstate Cerebral Palsy, Inc., d.b.a. the Upstate Caring Partners, has
administrative offices located at 125 Business Park Dr., Utica, NY 13502. The Clinton
Central School District placed M. C. into the Tradewinds Education Center purportedly to
satisfy its obligations under the IDEA.

   i.  The Tradewinds Education Center is a non-public school approved by the New
       York State Education Department.[1] The primary goal of its education program is
       for students to develop skills that will facilitate their return to a more independent
       environment.  According to UCP's website, "[a] primary emphasis of the
       Tradewinds program is to provide a therapeutic environment for children,
       supporting the development of social skills and communication. Using a
       comprehensive approach with each child, the education, clinical, and residential
       staff, in conjunction with families, develop and implement goals and objectives
       focused on the overall development of each student, providing a supportive,
       positive environment for all students to learn and grow."[2] Upstate Cerebral Palsy

---

[1] Application by a STUDENT WITH A DISABILITY, by his parents, for review of a
determination of a hearing officer relating to the provision of educational services by the Board
of Education of the Clinton Central School District, No. 24-189, 15 July 2024 (wherein Parents'
appeal was dismissed because "there is no error in the IHO's description of the parties' settlement
agreement" and Parents "are not aggrieved by the IHO's order that memorialized the terms
thereof and seek only enforcement of the order.").
[2] https://www.upstatecp.org/education/, accessed 22 September 2024.

also advertises that the Tradewinds Education Center employs master's level specialists in the field of developmental disabilities as well as special education teachers, aides, counselors, therapists, nurses, psychologists, and administrators.[3]

ii.    The IDEA provides for placement of special education students in private schools at public expense to ensure students with a disability receive the public education to which they are entitled. When M. C. was placed in UCP's Tradewinds Education Center at public expense, parents assert that the Tradewinds Education Center plausibly fits the definition of an intended recipient of federal financial assistance under the Rehabilitation Act.

iii.    Parents note that, in 2022, Upstate Cerebral Palsy signed an agreement between the New York State Department of Health and service providers under contract with school districts enrolled in the New York State Medicaid School Supportive Health Services Program (SSHSP). The District is enrolled in SSHSP. As part of that agreement, Upstate Cerebral Palsy agreed to "[c]omply with Title VI of the Civil Rights Act of 1964, Section 504 of the Federal Rehabilitation Act of 1973, and all other State and Federal statutory and constitutional non-discrimination provisions which prohibit discrimination on the basis of race, color, national origin, *handicap*, age, sex, religion and/or marital status."[4]

---

[3] *Id.*

[4] Provider Agreement with the New York State Department of Health and the Service Providers Under Contract with the School District which is enrolled in the New York State Medicaid School Supportive Health Services Program (SSHSP), signed 01 June 2022. Emphasis added.

iv.    As a State-approved non-public school, the Tradewinds Education Center is
subject to Federal and New York State laws and regulations governing the
education of students with disabilities.[5]

## STATEMENT OF FACTS

7.    Plaintiff M. C. is a 16-year-old child and is dually diagnosed as having Down Syndrome
and Autism by a neuropsychologist at Massachusetts General Hospital and a private
psychologist in Albany, NY. He has exhibited behavioral challenges since he entered
kindergarten. M. C. remains at significant risk for continued enrollment in the
Tradewinds program at UCP's Tradewinds Education Center in Rome, NY.

8.    M. C. attended two years of pre-school in a fully integrated classroom. He received pre-
academic instruction as well as speech, physical, and occupational therapies at school.
Ironically, his pre-school program was at Upstate Cerebral Palsy's New Discovery
Learning Center in the very same building where M. C. has been in the highly segregated
Tradewinds program since 2019.

9.    M. C. entered the public school system in the Canastota Central School District,
Canastota, NY. He spent four years in a co-taught, integrated classroom of twenty-plus
students, having repeated both kindergarten and first grade.[6] M. C.'s program consisted

---

[5] Application by a STUDENT WITH A DISABILITY, by his parents, for review of a
determination of a hearing officer relating to the provision of educational services by the Board
of Education of the Clinton Central School District, No. 24-189, 15 July 2024.
[6] The repeat of first grade resulted from an agreement with the school district to maintain M. C.
in an integrated educational environment in lieu of a due process complaint. Parents were
working with a parent-attorney at that time.

of typical academic instruction as well as music, art, and physical education. He also received speech, physical, and occupational therapies at school. M. C. went on field trips and attended school concerts with his class, made weekly visits to the school library with his classmates, and enjoyed his time at Canastota school district alongside non-disabled and disabled peers. M. C. even learned the Pledge of Allegiance. At the end of M. C.'s second year of kindergarten, Parents were successful at eliciting from his teacher that his educational program at Canastota conferred meaningful benefit to M. C., even though he exhibited challenging behaviors at school and made uneven academic progress for the two years he was in kindergarten.

10. During M. C.'s fourth and final year in the Canastota school district, the district consulted two board-certified behavior analysts (BCBA) to address M. C.'s behavioral challenges. Jessie Kanowitz, M.A., BCBA, LBA, conducted a functional behavior assessment (FBA) of M. C. during November and December of 2016 and issued an assessment report in January 2017. As reported in the FBA, M.C. engaged "in several problem behaviors, which include[d] throwing (books, shoes, materials, food), grabbing, hitting, pinching, kicking, swiping materials, taking clothing off (jacket, shoes, shirt), vocalizations ("eh"), flopping, mouthing, ripping (paper, books), biting, bolting, dumping, and crying."[7] Baseline data reported in the FBA indicated that M. C. engaged in an average of 8 episodes of problem behaviors per day, lasting for a cumulative average of 10 minutes per day. In February 2017, Tammy Thomas, M.S., L-BCBA, observed M. C. in school and shortly thereafter developed a formal behavior intervention plan (BIP) for the Canastota school district. The high-level goal for the intervention plan was to "reduce

---

[7] Functional Behavior Assessment of M.C., Jessie Kanowitz, January 2017.

[M.C.'s] frequency of problem behaviors at school by 50% by the end of the 2016-17 school year."[8] Ms. Thomas subsequently issued monthly behavioral consultation summaries to document the process that governed the intervention plan.

11. Ms. Thomas met with the Canastota educational team in April, May, and June of 2017 to "review the team's progress with implementing strategies as recommended in [M.C.'s] BIP, address questions and concerns and review data."[9] In all the of the summaries, Ms. Thomas noted that M. C. continued to "make some gains in adaptive behaviors in the classroom" and "[t]he team stated that problem behaviors (see FBA for list of target behaviors) have decreased in intensity." In April 2017, Ms. Thomas reported that M. C. "averaged 2.9 target behaviors per day (highest daily rate was 7, the lowest was 0) and averaged 2.1 breaks per day (highest daily rate was 3, the lowest was 0)."[10] In May 2017, Ms. Thomas reported that M. C. "averaged 1.4 target behaviors per day (highest daily rate was 5, the lowest was 0) and averaged 1.5 breaks per day (highest daily rate was 3, the lowest was 0),"[11] noting that "[o]f 17 days in attendance, [M.C.] was free of target behaviors on 8 days." In June 2017, Ms. Thomas reported that M. C. "averaged 1.5 target behaviors per day (highest daily rate was 5, the lowest was 0) and averaged 2.1 breaks per day (highest daily rate was 2, the lowest was 1)."[12] In May and June of 2017, Ms. Thomas state that "[i]f [M. C.'s] behaviors continue to reduce in this manner, he is projected to meet his BIP by the end of the school year."[13]

---

[8] Behavioral Consultation Summary, Tammy Thomas, 02 February 2017.
[9] Behavioral Consultation Summary, Tammy Thomas, 10 April 2017.
[10] *Id.*
[11] Behavioral Consultation Summary, Tammy Thomas, 08 May 2017.
[12] Behavioral Consultation Summary, Tammy Thomas, 01 June 2017.
[13] *Id.*

12. In July 2017, Parents moved into the Clinton Central School District. Prior to the move, the District's Director of Pupil Personnel Services and Instruction, Ms. Kathleen Fonda, responded to Parents: "We reviewed the documents that you shared with us and when looking at the class profile of our 12:1:1 classes, we would be looking at an OHM BOCES placement for [M.C.]. As you know we are a small district and have limited options in house. We have a number of students who are enrolled in BOCES programs to meet their academic, social, physical and behavioral needs met." Ms. Fonda also noted that "[m]any of our students *with similar profiles* to [M. C.] have done very well in the BOCES school based programs."[14] The District did, in fact, apply M. C. to the OHM BOCES program despite objections from Parents about placing M. C. in a more restricted setting. But BOCES did not accept him, and Parents' objections became moot because the District had little choice but to allow M. C. to attend a District school for the 2017-2018 academic year.

13. M. C. started his 2017-1018 school year in a general education setting but was moved to a special education classroom within District because he displayed a resurgence of frequent behavioral challenges. The District hired a behavioral consultant to address M. C.'s re-emergent behavioral challenges. In October 2017, the District removed M. C. from the special education classroom and placed him in a staff member's office ("the room") for his entire school day. In fact, the behavioral consultant notes that she "discussed that the room can be changed so that [M.C.] can really access the environment,"[15] and recommended having "a desk in the room so that the instructor can

---

[14] Email correspondence from Kathleen Fonda, Director of Pupil Personnel Services and Instruction, to Parents, Clinton Central School District, 20 June 2017. Emphasis added.
[15] Consultation Report - Clinton Elementary School - M. C., Jessie Kanowitz, October 27 2017.

sit on one side and M. C. on the other sitting across from her" as well as having "a rug or carpet on the floor so that the instructor and [M.C.] can do some work on the floor and move away from the table for a period of time."[16] Even in this context, M. C. received academic instruction as well as speech, physical, and occupational therapies. Parents are unaware of any follow-up in which collected data was analyzed, meetings were held to assess and discuss continued M. C.'s challenges, or further adjustment made to the behavioral consultant's recommended protocols.

14. In late October 2017, the District also held a program review of M.C.'s special education program and services and summarized its findings in a Notice of Recommendation. The Notice indicates that "[t]he Committee of Special Education recommend[ed] that the academics be provided in a 1:1 setting with a special education teacher. Additionally, due to [M.C.'s] fatigue, which impacts behaviors, [an] abbreviated day had been recommend."[17] The District proposed this action because "[M. C.'s] aggressive behaviors and limited academic skills warrant the proposed changes."[18] The Notice also documents that, despite Parents' objections to M.C.'s school day being only half a day, "[t]he extension on [M.C.'s] school day was discussed but not recommended at this time due to [M.C.'s] fatigue and increase in behaviors."[19]

15. In March 2018, Parents agreed to a *temporary* homebound placement for M. C. as Parents sought help from the Family Behavior Analysis Clinic at Upstate University

---

[16] *Id.*
[17] Prior Written Notice, Clinton Central School District, 08 November 2017.
[18] *Id.*
[19] *Id.*

Hospital (at Parents own expense).[20] While in this placement, the District provided

instruction and therapy services to M. C. at his home for a *total of about one hour per*

*school day*, which included instruction in reading, writing, and arithmetic as well as

speech, physical, and occupational therapies. Parents note that the educational and

therapy staff did the best they could to manage M. C.'s behaviors but there was no formal

behavior intervention plan or services in place; the District's behavioral consultant was

no longer in the picture and the clinicians at the Family Behavior Analysis Clinic were

not focused on M. C.'s home-based educational environment.

16. In December 2018, the District documented in a Prior Written Notice that "[t]he

Committee of Special Education (CSE) recommends that [M.C.] continue to receive

Special Education services (SEIT, Speech, Occupational Therapy, Physical Therapy) at

his home for the remainder of the 2018-2019 school yeawr [sic]."[21] The Notice explained

that M. C. "is participating in a behavioral clinic to address his intense behaviors,"[22]

noting that "Parents are planning to get [M.C.] a neuro-psychological evaluation. Parents

will obtain a doctors [sic] note recommending that [M.C.] be provided home-bound

instruction so that he can attend the behavior clinic."[23] Parents refused to and, in fact, did

not provide such a note from M.C.'s doctor. Nevertheless, this homebound placement

stood until December 2019.

---

[20] Parent's attorney proposed this plan as a potential path forward with hopes that M. C.'s
challenges could be addressed successfully in the Family Behavior Analysis Clinic, and M. C.
could return to District schools.
[21] Prior Written Notice, Clinton Central School District, 06 December 2018.
[22] *Id.*
[23] *Id.*

17. In February 2019, the Psychology Assessment Center at Massachusetts General Hospital conducted a private neuro-psychological evaluation of M. C. Parents note that the District should have performed a comprehensive triennial reevaluation of M. C. in 2019, but this private neuro-psychological evaluation was the singular basis for the District's ensuing rationale. Among the recommendations in the resulting report were these:[24]

    i.    M. C.'s educational program must provide consistent educational services across a full year, for a minimum of 240 days per year. Class must meet at least six hours per day five days per week, with the same teacher, aides, therapy staff (such as, Speech Therapy, Occupational and Physical Therapy, etc.), and students. The class should be comprised of no more than six to seven students, with an overall teacher-to-student ratio of no more than 1:2. Educational services must be based on a substantially separate 1:1 Discrete Trial Training model.

    ii.    The classroom teacher must be certified in Special Education but should also have had substantial specific training and experience in the education of elementary school children diagnosed with Autism and Intellectual Disabilities.

    iii.    A Functional Behavior Analysis (FBA) should be conducted by a licensed behavior analyst and/or licensed psychologist with extensive expertise in working with individuals with severe challenging behavior and autism/developmental delays to assist in the understanding of those variables responsible for behavioral difficulties ... and his failure to make effective use of

---

[24] Neuropsychological Evaluation, Kay Seligsohn, Ph. D., Psychology Assessment Center, Massachusetts General Hospital, 22 Feb 2019.

educational opportunities. *Such an evaluation should be completed in M. C.'s classroom(s), at his home, on the bus, and in the community.*

    iv.    M. C. must receive a minimum of 10 hours of Home-Based 1:1 direct educational services weekly (in addition to the 30 hours per week of school based services), for a minimum of 48 weeks per year. This level of service is based on his level of disability and educational needs. Services should include direct instruction … with the primary goal of generalizing and maintaining M. C.'s behavioral and social skills.

18. In Sep 2019, the District signaled that UCP had an opening for M. C. at UCP's Tradewinds Education Center, Rome, NY. Accordingly, the District issued a Prior Written Notice stating that "[M. C.'s] intense behaviors hinder his progress. Those behaviors are symptomatic of Autism. To address those behaviors in preparation for placement at Tradewinds, a new FBA/BIP will be conducted. [M. C.] continues to be appropriate for a placement at [UCP] Tradewinds 6:1:3.5 program."[25]

19. In November 2019, the Clinton school district held a Committee of Special Education ("CSE") meeting to finalize M.C.'s placement into Tradewinds. During this meeting the CSE stated that, following "a week or so of observation [of M. C., Tradewinds' staff] decide what assessments they want to do. Then they make goals and programs."[26] The meeting was contentious because, despite the fact that the District kept harping about the frequency and intensity of M.C.'s behavioral challenges in the two years leading up to the

---

[25] There is no supporting evidence that Autism is the cause of M.C.'s behavioral challenges. Some professionals argue that ascribing any characteristic of M.C.'s disability on either Down Syndrome or Autism is a fool's errand.

[26] CSE meeting minutes, Clinton Central School District, 26 November 2019.

November 2019 meeting, the CSE members insisted during this meeting that Tradewinds'
needed first to perform a 45-day evaluation of M.C. before Tradewinds would commit to
a functional behavior assessment of M. C.. The CSE members challenged whether a
functional behavior assessment of M. C. would be even needed, given that M.C. would
be immersed in a "therapeutic" environment. Indeed, one meeting participant offered that
"[M.C.] may not need an FBA/BIP"[27] at all, to which a "very skeptical"[28] Parent "quoted
the Mass General [neuro-psychological evaluation] report regarding a FBA/BIP."[29]

20. Another significant point of discussion revolved around academic instruction, where the
CSE argued that the 45-day evaluation period would yield an instructional evaluation
report – the CSE having specifically suggested that a Verbal Behavior Milestones
Assessment and Placement Program (VB-MAAP) would be performed on M.C. as part of
the evaluation. The CSE also discussed evaluation reports for speech, physical, and
occupational therapies, wherein another meeting participant "[r]eassessed permission to
test for OT/PT, Speech and scripts."[30]

21. Following the November 2019 meeting, the District issued a Prior Written Notice stating
that "[t]he Committee of Special Education (CSE) continues to recommend that [M.C.]
attends the 6:1:3.5 program at Tradewinds/UCP in Rome"[31] because "[M. C.'s] intense
needs warrant the therapeutic service provided by Tradewinds." Although the Notice
explains that "Tradewinds provides a comprehensive approach that includes the

---

[27] *Id.*
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] Prior Written Notice, Clinton Central School District, 05 December 2019.

principles of applied behavior analysis,"[32] it also notes that "[t]he need for completion of a Functional Behavior Analysis (FBA) and a Behavior Improvement Plan (BIP) was discussed. The Behavior Specialist at Tradewinds explained that once [M. C.] is in program and they have had time to get to know him, the need for a BIP/FBA will be determined."[33]

22. The CSE held several meetings with Parents in first-quarter 2020 to continue hashing out the issue of the FBA/BIP. During each such meeting, Tradewinds' senior behavior special insisted that M. C.'s behavior did not warrant an FBA in the Tradewinds environment. Indeed, during a January 2020 CSE meeting, the senior behavior specialist argued that M. C.'s "[b]ehaviors have improved" and that the "BCBA doesn't feel [M. C.] needs an FBA/BIP."[34] To support this claim, during the meeting a "[g]raph was handed out to show behaviors. ... Graph was explained and they are going to fill in the gaps."[35]

23. In April 2020, Parents followed up with the District to ask whether more behavioral observation and data had taken place, noting that "[t]he week after the last CSE meeting, [M. C.'s] teaching aide noted in [M. C.'s] daily communication log that data collection was beginning."[36] Tradewinds' senior behavior analysts responded to an email from the District that "[w]e discussed the very minimal/no problem behaviors at the last [CSE] meeting (with graphs) so we have not collected any since. There have been no behaviors to document while school was in session so there is no new information to report at the

---

[32] *Id.*
[33] Prior Written Notice, Clinton Central School District, 05 December 2019.
[34] CSE meeting minutes, Clinton Central School District, 21 January 2020.
[35] *Id.*
[36] Email correspondence from Parent to the Clinton Central School District, 29 April 2020.

meeting."[37] But these claims were belied by daily observation notes (i.e. in a daily communication notebook) that M.C.'s classroom staff sent home to Parents from December 2019 through to about April 2020. During the same period that Tradewinds' behavior analyst claimed M. C. exhibited "very minimal/no problem behaviors," M. C.'s classroom staff Tradewinds documented informal notes about his daily struggles and successes from December 2019 through April 2020. These notes show that M. C. continued to exhibit the very behaviors that the District referred to in several Prior Written Notices and that these behaviors occurred several times on most school days.

24. Although evaluation reports for speech, physical, and occupational therapies were completed in April 2020, neither an instructional evaluation report was written nor instructional assessments completed for M. C., per the plan discussed in a November 2019 CSE meeting. In fact, the District asked a Tradewinds administrator about the status of any instructional evaluation report: "Is there anything academic? I was under the impression that [M.C.] was being assessed for the first 90 [sic] days. Could you explain how the academic goals will be determined?"[38]  In response, Tradewinds' senior behavior analyst said that "[w]hen we last met, we discussed [M.C.'s] performance on the VB-MAPP and where his current skill lies – more in the 18-30 month skill level which wouldn't lend his [Individual Educational Program (IEP)] to more traditional 'academic' IEP goals at this time. The goals identified are targeted to teach [M.C.] to more

---

[37] Email correspondence from Tradewinds' senior behavior analyst, Dr. Mara Vanderzell, to the Clinton Central School District, 30 April 2020.

[38] Email correspondence from Tradewinds' senior behavior specialist, Dr. Mara Vanderzell, to Clinton school district's Director of Pupil Personnel and Services, Kathy Fonda, 28 April 2020.

independently participate in his school day – and build more functional skill repertoires."[39]

25. In January 2024, Parents presented UCP with some feedback in which Parents argued that "there is no rule, restriction, or constraint that stops a special school from teaching functional academics to its students."[40] Parents furthermore insisted that "special schools should be able to do more to teach students with complex needs functional reading and math literacy, even though it's more difficult to do so with this student population."[41] In response, UCP stated they agreed with the position that "there are no 'limits imposed' on us that would 'deny a special school' from teaching 'students how to read, write, and do arithmetic', and, again, have never claimed such."[42] UCP also noted that they "work on these [functional academic] skills with many of our students who have the prerequisite skills to work on such goals,"[43] and that UCP is "in complete agreement that [their] students should be taught functional academics which is why we have embraced the EFL curriculum."[44]

26. Yet the Defendants have argued against providing instructional services for M. C., and the Plaintiffs and Defendants have been in a tense and unending disagreement over access to and the delivery of certain instructional services to M. C. as a participant in the Tradewinds program. Parents have effectively articulated and ardently advocated that

---

[39] *Id.*
[40] Email correspondence from Parents to UCP's Executive Vice President of Education Programs, Jeremy Earl, 23 January 2024.
[41] *Id.*
[42] Email correspondence from Jeremy Earl to Parents, 24 January 2024 [in response to Parents' email].
[43] *Id.* Emphasis added.
[44] *Id.*

"[f]unctional academics are adaptive skills developed sufficiently to allow persons ages 5 and older to be successful in daily activities in and outside the school environment, to increase their independence, and to promote their ability to succeed in a less restrictive environment."[45] In this context, Parents have made clear their understanding that a program that provides access to functional academics "utilizes instruction that results in the acquisition of reading, writing, and math adaptive skills at least at a basic level that enables a person to perform daily routines."[46] The debate between Plaintiffs and Defendants did not center around instructional pedagogy or even the choice instructional materials; the debate was much more fundamental: is it reasonable to expect that M. C. have access to and opportunity to receive instructional services that include functional academics?

27. Since 2021, the Defendants have been pushing back squarely on Plaintiffs' repeated requests that M. C. be given *at least* the opportunity to access certain instructional services that are available to other students in the Tradewinds program. During this years-long debate, UCP's chief psychologist declared in meetings that M. C.'s working memory test scores precluded M. C. from learning how to *read for meaning*, and this chief psychologist stood his ground that Tradewinds not provide *any* reading instruction services to M. C. Additionally, Tradewinds' senior behavior analyst took a deliberate stance against providing M. C. with opportunity to access certain functional-academic instructional services, and she repeatedly engaged Tradewinds' teaching staff and the

---

[45] Adaptive Behavior Assessment System-II, Clinical Use and Interpretation, Practical Resources for the Mental Health Professional. 2008, Pages 93-114.
[46] *Id.*

Clinton school district to neutralize Parents' efforts to obtain reasonable instructional services for M. C.

28. The arguments against providing M. C. access certain instructional services also invoked a defense against future litigation. For example, in response to a PowerPoint presentation that Parents created for a routine meeting about M. C.'s program, Tradewinds' senior behavior analyst reiterated that she was "hesitant to add these stretch (reading) goals that [Parent] is proposing for fear that when [M. C.] doesn't make progress, we will be back in this litigation space."[47] In a follow-up email, UCP's Senior Executive Vice President of Education Services double-downed on UCP's stance against instructional services for M. C. – writing that he was "preparing to have conversations with legal representation to put our ducks in a row to discuss how to best protect our agency, and, to get a legal opinion on how firm of a stance we can take with this family about the type of programming at we offer,"[48] concluding that "I really feel like we need to take a strong stance as to the type of program that we are to prevent a lawsuit from this family down the road."[49]

29. In October 2023, Upstate Cerebral Palsy sent a letter to the parents of students in their Tradewinds program, explaining that "by the end of October [UCP's] ability to provide speech to students in the Tradewinds program will be significantly limited due to staffing

---

[47] Email correspondence from Tradewinds' senior behavior analyst, Dr. Mara Vanderzell, to the Clinton school district, 19 October 2021 (while explaining her assessment of a PowerPoint presentation Parents created to advocate for functional literacy in M. C.'s program at Tradewinds. Also, in reference to the fact that Parents filed a complaint against UCP with the New York State Education Department earlier that year.).

[48] Email correspondence from Jeremy Earl to the District's Director of Pupil Personnel Services, Kathy Fonda, 08 Oct 2021 (after Ms. Fonda indicated that she disagreed with Dr. Vanderzell's comments in the 19 October email).

[49] *Id.*

vacancies."[50] The letter further said that "[UCP] has a need for seven speech staff to cover all recommended services" but "by the end of October, [UCP] will have two speech staff working in our school age program. Based on this significant staffing vacancy, we will be unable to cover the majority of currently recommended IEP speech services."[51]

30. In April 2024, M. C.'s 2nd quarter report stated that "[c]urrently, student does no[t] receive speech therapy service due to the lack of speech therapists available to provide this service. Notifications have been made to parents and the district regarding this."[52] And in June 2024, the Clinton Central School District issued a Prior Written Notice that notes "[s]peech [t]herapy as a monthly classroom consult,"[53] and that M. C. no longer received speech therapy as an accommodating service.

31. In November 2023, Parents sent to Tradewinds questions in preparations to "select candidate professionals to conduct an independent educational evaluation of [M.C.] and an FBA to be conducted by an independent BCBA (the District has agreed to these)."[54] In response, Tradewinds' senior behavior analyst stated that "[o]nce you have identified IEE and FBA professionals, we are happy to answer any questions they may have as it

---

[50] Letter from Jeremy Earl, Executive Vice President, Education, Upstate Cerebral Palsy, to parents 13 October 2023 (explaining why speech therapy services for Tradewinds' students will be impacted).

[51] *Id.*

[52] M. C.'s 2nd quarter report card, Tradewinds program, 15 April 2024.

[53] Prior Written Notice, Clinton Central School District, 20 June 2024.

[54] Email correspondence from Parent to Tradewinds' senior behavior analyst, Dr. Alicia Zielenski, 05 November 2023 (to ask for answers to questions about M. C.'s program in anticipation of agreement with the Clinton school district on independent educational evaluations).

relates to [M. C.'s] programming. We look forward to hearing from you and/or Clinton [school district] once these services have been secured."[55]

32. In November 2023, Parents filed a due process action against the District to request "of the Clinton Central School District to pay for an independent educational evaluation (IEE) of our son in a challenge to a triennial reevaluation that the school initiated in 2022."[56] Parents explained in an amended filing that "[s]ince the school district neither granted Parents' request in a timely manner nor filed a due process complaint to argue why they disagreed with the Parents' request, Parents eventually filed the original complaint to address their concerns."[57]

33. In April 2024, an administrative hearing officer issued a one-page ORDER to memorialize that the Parents and the District "agreed to resolve all the issues raised in the parent's due process complaint."[58] This ORDER clearly states that the District was to pay for: a) an independent "inclusion and educational environment assessment *of* the student's current placement"[59]; b) "a private Functional Behavioral Assessment to be conducted by an independent board-certified behavioral analyst who has a degree in education so that they can integrate the instructional components into a behavior assessment"[60]; and c) "an independent psycho-educational evaluation which will include

---

[55] Email correspondence from Dr. Zielenski to Parent, 07 November 2023 (in response to Parent's 05 November 2023 email, in which Dr. Zielenski did not address a single question that Parent raised.)

[56] *Due Process Complaint Notice on Behalf of M. C. Submitted to the Clinton Central School District Board of Education*, 27 November 2023.

[57] *Amended Due Process Complaint Notice on Behalf of M. C. Submitted to the Clinton Central School District Board of Education*, 09 January 2024.

[58] ORDER, *In the Matter of the Due Process Complaint Michael and Dawn Carpenter on Behalf of M. C., a Student with a Disability, v. The Clinton Central School District*, 09 April 2024

[59] *Id.* Emphasis added.

[60] *Id.*

a specific and targeted reading evaluation by a reading specialist to be conducted by a qualified provider."[61]

34. Following issuance of the hearing officer's ORDER, Parents sent email to both the District and UCP's Senior Executive Vice President of Education Services (with UCP's Chief Executive Officer on copy) to apprise them that a small team of independent evaluators were planning to observe M. C. in his Tradewinds classroom, and to initiate more detailed visitation plans at both Tradewinds Education Center and a District school.

35. The District did not engage Parents' request for help in coordinating with UCP and Parents' evaluator to prepare for requested observations. Moreover, when Parents' evaluator reached out to the District to provide the mandated tax information and set up billing, the District started pushing back on the evaluator about the scope of the functional behavior assessment and its cost – which the hearing officer had ordered at "market rate."[62] Specifically, the District unnecessarily challenged the evaluator's plan to observe M. C. "in multiple environments given the intensity of [M.C.'s] behaviors." [63] In response, Parents' evaluator provided the District with "detailed information supporting this contention based on our initial review of [M. C.'s] records as well as relevant research,"[64] to which "no response was provided, only an email dated 4/30 stating that 'the district is willing to cover costs up to $2,500.'"[65] This left the observations for the FBA unresolved, where Parents' evaluator explained that "[g]iven the fact that we are

---

[61] *Id.*

[62] *Id.*

[63] Email correspondence from Dr. Jenna Rufo, CEO of Empower ED School Solutions, to the Clinton school district, 02 May 2024.

[64] *Id.*

[65] *Id.*

unable to come to agreement on a reasonable cost for this evaluation, as well as the

district's prior refusal to allow observations across multiple settings, we will need to

postpone the FBA until an agreement can be reached."[66]

36. The District also pushed back on the inclusion and educational environment assessment

memorialized in the April 2024 ORDER. The District argued in email correspondence

that "Clinton Central Schools is not within the scope of this evaluation; we are required

to fund the inclusion assessment of current placement."[67] But Parents' evaluator noted

that "[p]art of the inclusion assessment entails an observation of the general education

environment to determine if a less restrictive setting could be achieved, and if so, what

supports and services would be necessary to support [M. C.]. Conducting an inclusion

assessment in a self-contained, separate day school will not provide comprehensive

information with which to make recommendations."[68]

37. When Parents initially reached out to UCP to start coordinating school-based

observations in support of the independent educational evaluations, they sent email to

UCP's Senior Executive Vice President of Educational Services and UCP's Executive

Director. Neither UCP executive replied even after Parent sent a follow-up email. Instead,

UCP's attorney responded to Parents' solicitation for coordinating with the evaluators,

explaining that her "client asked me to reach out to you regarding your request to have

independent evaluators conduct evaluations at TEC,"[69] and asking that Parents "direct

---

[66] *Id.*

[67] *Id.*

[68] *Id.*

[69] Email correspondence from UCP's attorney, Anne McGinnis, to Parents, 24 April 2024 (in response to Parents' initial request for help coordinating school observations at Tradewinds in support of the independent evaluations).

future communications regarding the independent evaluations to my attention due to the legal nature of the due process hearing order."[70] UCP's attorney further explained that her "client points out that it was not a party to the due process hearing and so cannot be directly ordered to provide any relief as a result of that hearing, including accommodating independent evaluators at its school,"[71] noting that "these evaluations are highly unusual in their setting as the law in NY does not allow for parents to obtain an FBA as an IEE and an 'inclusion evaluation' is not a CSE evaluation within the special education regulations."[72] UCP's attorney also stated that Tradewinds was "willing to cooperate with the independent evaluators for the FBA, inclusion evaluation, and, as applicable, the psychoeducational IEE."[73]

38. But UCP's cooperation with the Parents and their evaluator came with conditions. UCP's attorney asserted that UCP needed "more specifics about the parameters of those evaluations, including the information that will be collected, what is being asked of TEC, and the time commitment involved, and will need those parameters to be in writing,"[74] noting that UCP would then "identify anything that will or will not be permissible to take place at their school."[75] Parents and their chosen independent evaluator complied by answering a set of questions about each of the three independent evaluations memorialized in the hearing officer's April 2024 ORDER.

---

[70] *Id.*
[71] *Id.*
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *Id.*

39. Even after addressing the five questions that UCP required be answered, UCPs attorney took an unsettling interest in the inclusion and educational environment assessment and asked for "some additional information regarding the inclusion evaluation,"[76] explaining that "[w]e are unfamiliar with this type of evaluation; therefore, Tradewinds requests more information regarding the *purpose of the evaluation* and the information that will be collected for the observations and communications with Tradewinds employees."[77] It is at this point Parents starting pushing back on UCP's demands, particularly on the demand for the *purpose* of the inclusion and educational environment assessment and especially since Parents and their evaluator had provided the same level of information to UCP about the assessment as they had for the other two assessments; frankly, Parents believed the *purpose* for the inclusion and educational environment assessment was none of UCP's damned business. After a round or two of tense emails, Parent shot back with a terse and pointed response in which Parent told UCP's attorney what she and UCP could go do with themselves. In response, UCP's attorney reminded Parents that "you have no legal right to my client's participation with the IEEs."[78] Parents note here that they duly notified UCP's attorney that UCP 'just earned a civil lawsuit.'"[79]

---

[76] Email correspondence from Anne McGinnis to Parents, 06 May 2024 (in which McGinnis acknowledges that Parents provided UCP with the requested information about all three independent evaluations and says UCP "agrees to participate in the psychoeducational evaluation and FBA").

[77] *Id.* Emphasis added.

[78] Email correspondence from Anne McGinnis to Parents, 09 May 2024.

[79] Email correspondence from Parents to Anne McGinnis, 08 May 2024 (in response to UCP's demand for the purpose of and more information about the inclusion assessment).

40. In April 2024, M. C. was subject to private psychological and neuropsychological testing at the Boston Children's Hospital, Boston, MA. The recommendations in the resulting report are, in part, as follows:[80]

    i.    M. C. requires placement in a full day, full year *substantially separate placement*[81] specific to the needs of individuals with Intellectual Disabilities and Autism Spectrum Disorders. The goal of this instruction should focus on developing the foundational skills required for him to participate in the least restrictive educational placement possible.

    ii.    M. C.'s therapeutic program should include at least 15 hours (or three hours per day) of *one-to-one* Applied Behavioral Analysis. This could be provided at school or in the home environment. The goal of this treatment would address specific goals, including improving communication, establishing compliance and imitative behaviors needed for classroom instruction, acquiring basic adaptive skills, and improving joint attention skills. It is medically necessary for M.C. to receive Applied Behavioral Analysis (ABA) therapy in the home setting.

    iii.    M.C. requires *intensive* occupational therapy, physical therapy and adaptive physical education instruction as part of his educational program. M. C. requires *intensive* speech therapy services in a one-to-one and group setting.

---

[80] REPORT OF PSYCHOLOGICAL AND NEUROPSYCHOLOGICAL TESTING, Nancy Sullivan, Ph. D., Attending Psychologist, Division of Developmental Medicine, Boston Children's Hospital, 30 July 2024 (noting that the recommendations in the report "should be considered medically necessary and required for [M.C.] to make effective progress.").

[81] The Massachusetts Department of Elementary & Secondary Education defines a substantially separate placement/classroom as "special education services outside the general education classroom more than 60% of the time."

iv.  Academic Instruction: M.C. requires intensive reading and applied academic

skills in a one-to-one setting a minimum of one hour per day.

41. In July 2024, M. C.'s fourth-quarter report card noted that his "[t]reating therapist has left

[her] position as of 5/29/24, therefore goal progress cannot be noted at this time."[82] Thus

M.C. received no accommodating occupational therapy services during his 2024 summer

session at Tradewinds.

42. Despite that M. C. "has expressed an interest in working in stores, such as Walmart and

Lowe's, and at a hotel for his future plans",[83] the District documents that, after

graduation, M. C. "will participate in vocational opportunities *through a vocational based*

*day habilitation program* to increase his independence and develop skills in vocational

related areas."[84] Day habilitation programs purportedly "develop essential independent

living skills and cultivate natural support systems such as accessing local resources,

contributing to non-profit organizations, socializing, honing culinary skills, making art,

staying fit, learning financial literacy, navigating public transit systems and much

more!"[85] However, according to a fact sheet published by a division of the National

Disability Rights Network, "[o]ne of the most salient features of facility-based day

habilitation is the segregation of persons with disabilities in a congregate setting that is

divorced from contact with real social spaces and persons without disabilities."[86]

---

[82] M.C.'s 4th quarter report card, Tradewinds program, 24 July 2024. Parents were not advised that M. C.'s occupational therapy services would be suspended/terminated.
[83] M. C.'s Individualized Education Plan, 25 October 2023.
[84] *Id.* Emphasis added.
[85] https://www.ahrcnyc.org/services/community/adult-day-services/day-habilitation/, accessed 05 July 2024.
[86] *Challenging Segregated Day Habilitation Services Under the ADA's Integration Mandate*, Samuel R. Miller, Center for Public Representation, March 2015.

# LEGAL FRAMEWORK

## Americans with Disabilities Act

43. Congress enacted the ADA to provide a national mandate for the elimination of discrimination against individuals with disabilities, noting that society tends to isolate and segregate individuals with disabilities and that individuals with disabilities continually encounter various forms of discrimination. Congress also determined that the Nation's proper goals regarding individuals with disabilities are to assure *equality of opportunity, full participation, independent living*, and economic self-sufficiency for such individuals. The Plaintiff are individuals with disabilities, and we believe in these simple ideas.

44. Title II of the ADA prohibits disability discrimination in public services. Plaintiffs understand this to mean that no qualified individual with a disability should be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity, because of the limitations of his or her disability. More importantly, regulations implementing the ADA require that a public entity must administer their services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities. Plaintiffs assert that, with the sole exception of where he attends school, M. C. lives and has always lived in his community and his segregation in UCP's Tradewinds is neither necessary nor justified in light of who he is.

45. Discrimination in the public forum is neither an abstract legal concern nor is the

educational system immune to discriminating against individuals with a disability. In the

special education forum on Reddit, educators and parents often discuss their perspectives

on how the educational system discriminates against students with developmental and

intellectual disabilities. For example, one commenter recently said of the book *Out of My*

*Mind* by Sharon M. Draper "The main character is perceived as having value because

she's actually really smart – like the message was more of a 'don't judge a book by [its]

cover' type of thing. When reading stuff like this, I always think about the people who

actually do have intellectual disabilities. … The unspoken flip side of this message is that

if you're not 'secretly really smart,' you don't have value."[87] In yet another discussion, a

commenter asserted that private schools "really don't care about those that get left behind.

They actually would prefer if they [disabled students] didn't exist. And if they do exist,

they believe [disabled students] should be left at home."[88] These perspectives and many

others lay bare disconcerting views on discrimination in American education.


**Rehabilitation Act**

46. The Rehabilitation Act contains provisions to the ADA, requiring state agents to

administer services, programs and activities in the most integrated setting appropriate to

---

[87] r/special ed forum,
https://www.reddit.com/r/specialed/comments/1fx0vgm/comment/lqku6rt/?context=3, accessed
06 October 2024 (in response to the upcoming release of the movie Out of My Mind).
[88] r/special ed forum,
https://www.reddit.com/r/specialed/comments/1fowhcd/comment/louhnc4/?context=3, accessed
27 September 2024 (in response to a question entitled "Why do private programs for children
with disabilities exclude those who aren't potty-trained?").

the needs of qualified individuals with disabilities. To this end, Parents understand that state agents must make requested modifications for an individual with a disability unless the state can demonstrate the modifications are unreasonable and would fundamentally alter the services the state provides. In practical application, this seems to mean that a state agent must show that immediate relief for Plaintiffs would be inequitable to others, given that the state must address the needs of other individuals with disabilities.

    i.    Plaintiffs assert that M. C. is unquestionably a qualified individual with a disability. M. C. has been formally diagnosed as having Down Syndrome and Autism.

    ii.    The facts of M. C.'s circumstances show that accommodation and services he had for years are now reduced or removed because of staffing issues at Tradewinds. Not only are medical professionals supporting the importance of these services for M. C., said accommodation and services continue for some students in Tradewinds and, certainly, for students who attend District schools.

    iii.    Plaintiffs assert that nearly all, if not all, of the accommodation and services align with Defendants' fundamental charters to provide an education and prepare students for their future in an integrated society.

47. In an educational context, failure to provide reasonable accommodations and services denies students with disabilities equal educational opportunities, including access to effective academic instruction and social-emotional learning with non-disabled peers, and the opportunity to participate in and benefit from the same electives and extracurricular and school-related activities as students without disabilities.

i.    The facts of M. C.'s circumstances show that his educational opportunities are distinctly different from other students in his District, and that he has no opportunity to participate in and benefit from the electives and extracurricular and school-related activities as students without disabilities.

### Individuals with Disabilities Education Act

48. In general, a public school district must ensure that a reevaluation of a student with a qualified disability is conducted at least once every 3 years. If parents of this student do not agree with any aspect of a triennial reevaluation, Plaintiff's believe that the IDEA and federal regulations guarantee parents the right to obtain an independent educational evaluation(s) (IEE) of their child, and that the purpose, scope, design and/or aims of an IEE are not subject to either the concerns or objections of a school district. An IEE is defined as an evaluation conducted by a qualified examiner who is not employed by the public agency responsible for the education of the child in question.

49. Plaintiffs also believe they have the right to ask for an IEE(s) at public expense if the parent expresses disagreement with an evaluation conducted by the district, and requests that an IEE be conducted at public expense. If a parent requests an independent educational evaluation at public expense, the public agency must, without unnecessary delay, either (i) file a due process complaint to request a hearing to show that its evaluation is appropriate; or (ii) ensure that an independent educational evaluation is provided at public expense, unless the agency demonstrates in a hearing that the evaluation obtained by the parent did not meet agency criteria.

    i.    In this instance, the District did not perform on either of these required actions even after nearly a year of requests for IEEs.

50. Plaintiffs understand that case law has bandied about the IDEA's requirement that administrative relief be exhausted for matters related to a free and appropriate public education of M. C. In the context of the IDEA, there seem only a few exceptions to this general rule.

    i.    The Plaintiffs assert that they need not exhaust remedies through administrative procedures available to them under the IDEA because it is futile to do so, as the harms that Plaintiffs allege and the remedies that they seek are beyond the IDEA's scope.

    ii.    Plaintiffs assert that the gravamen of their claims under the ADA and Section 504 lies in M. C.'s unnecessary isolation, stigmatization, and denial of reasonable accommodation of his disability in light of the ADA's community integration mandate.

    iii.    Moreover, Plaintiffs assert that the Defendants interfered with and has not allowed Plaintiffs' full exercise of their right to independent educational evaluations (IEEs) of M. C. under the IDEA, through which the Plaintiffs hoped to challenge M. C.'s unnecessary segregation and need for accommodation in his educational program. Plaintiffs filed a due process complaint to exercise M. C.'s right to IEEs, and the District struck a formal agreement to fund – and presumably cooperate with the execution of – three evaluations/assessments (see *32).

    iv.    Plaintiffs even appealed their administrative case to the NY State Education Department to complain that the agreement could not be executed (see *33, *34,

*35, *36, *37, and *38). But the State review officer dismissed the appeal because Plaintiffs were not aggrieved by the due process, and the agreement with the District left undisturbed.[89] The State review office also noted that neither impartial hearing officers nor State review officers have authority to enforce prior decisions rendered by administrative hearing officers.[90] The State review officer further noted that "the 2nd Circuit has held that a due process proceeding is 'not the proper vehicle to enforce the settlement agreement.'"[91]

    v.    Therefore, Plaintiffs have already exhausted administrative remedies in seeking independent evaluations of M. C., and now must turn to the Court to enforce execution of their agreement with the District concerning these evaluations.

51. Furthermore, Plaintiffs assert, who in this instance claim discrimination under Title II of the ADA and Section 504, that they do not have to exhaust their remedies under the IDEA before seeking monetary damages.

    i.    An organization that discriminates intentionally or with deliberate indifference may be liable for compensatory damages.


# FACTUAL ALLEGATIONS


**M.C. is Unnecessarily Placed in an Overly Restrictive and Segregated Special School**

---

[89] Application by a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Clinton Central School District, No. 24-189, 15 July 2024.

[90] *Id.* The review officer refers in his decision to case law.

[91] *Id.* The review officer refers in his decision to other case law.

52. Plaintiffs allege that the Defendants intentionally discriminate against M. C. by unnecessarily maintaining M. C. in a highly segregated special school that denies him plausible and reasonable access to services and accommodation that are important to M. C.'s development and wellbeing and are necessary to help him overcome barriers to living more successfully in his community. Without such services and accommodation, M. C. will likely be – if not but for certain – perpetually subject to his current and future segregated settings and isolated from his community.

    i.    M. C.'s unwilling participation in UCP's Tradewinds program in and of itself reflects the challenges that M. C.'s disabilities present to society. The District has argued that "[M. C.'s] intense behaviors hinder his progress" and emphasized M.C.'s behavioral challenges as the primary reason for placement into UCP Tradewinds. Yet M. C. has never been provided with adequate therapy services to teach M. C. how to behave appropriately within his school setting. The Defendants have never provided intensive one-one school-based behavioral therapy and/or home-based behavioral therapy to M. C. despite recommendations for them (see *17.iii and *40.i).

    ii.    M. C. receives no substantive and/or *intensive* academic instruction to help him develop the functional reading literacy, numerical literacy, and writing/typing skills he needs to live in his community and gain employment beyond that of a sheltered workshop. M. C.'s pediatrician noted that "[i]t will be important to continue to develop Mason's functional academic skills,"[92] presumably because

---

[92] Developmental Medicine Visit, Dr. Meredith Close, Director, Down Syndrome Program; Attending Physician, Division of Developmental Medicine, Boston Children's Hospital, 13 December 2023.

M. C. "will require a vocational assessment in order to determine fit of future training goals and focus classroom objectives,"[93] with "[a]reas to be assessed include post-secondary education, employment, community involvement, self-advocacy, training, vocational training, job coaching, independent life skills, recreation training."[94] A recent neuropsychological evaluation of M. C. also recommended (functional) academic instruction for M. C.

iii.   The Defendants focus on M. C.'s disabilities and they insist that M. C. cannot and will never learn to read for meaning (see *26), is not prepared for "traditional" academics (see *24), and will fail to make progress when taught reading literacy skills (see *27). Plaintiffs assert that the issue is not whether M. C. *can* learn, but why it is the Defendants did not provide the services and accommodation that M. C. needs *to* learn.

iv.   Some of M.C.'s therapies have also been suspended due to staffing issues at Tradewinds. M. C. "requires speech and language therapy services to support the continued development of [his] articulation"[95] to interact with his community; that service came to an end around November 2023 (see *28). M.C. also requires intensive occupational and physical therapy to develop the occupational skills he will need to work in his community (see *40.ii); yet his occupational therapy came to an abrupt stop at the end of May 2024 (see *41).

---

[93] *Id.*
[94] *Id.*
[95] REPORT OF PSYCHOLOGICAL AND NEUROPSYCHOLOGICAL TESTING, Nancy Sullivan, Ph. D., Attending Psychologist, Division of Developmental Medicine, Boston Children's Hospital, 30 July 2024.

  v.  Should the Court doubt Parents' assertion that Defendants' actions and omissions today will likely harm M. C. into his future, we need only look at the Defendants' forward-looking proposition that M. C. "participate in vocational opportunities through a vocational based day habilitation program" (see *41). Clearly, if M. C. remains in his current trajectory, he will continue to experience life in congregate settings attended primarily by other disabled individuals.

  vi. Finally, Parents assert that M. C.'s current circumstances confer minimal benefit while exacting a significant toll on M. C.'s right to experience life on his terms and through his community, as is the case for most Americans. The sacrifice of his freedom is too high a price for almost nothing in return except for what amounts to glorified babysitting services at school. Parents note that even "the companies [UCP] have contact[ed] have speech staff that are currently available and/or interested in working with this population of students."[96] Parents ask why, if some professional therapy companies can choose not to work in Tradewinds, M. C. has no choice in the matter.

53. Plaintiffs allege that the Defendants intentionally discriminate against M. C. by unnecessarily maintaining M C. in a special school that segregates M. C. from his community and denies him all opportunity to interact with non-disabled peers during school hours. The Defendants continue to do so with deliberate indifference to Parents' ardent advocacy and repeated requests that M. C. be educated in a more integrated setting.

---

[96] Letter from Jeremy Earl, Executive Vice President, Education, Upstate Cerebral Palsy, to parents, 13 October 2023.

i.  Independent psychologists have, to date, never specifically recommended that M. C. be placed in a special school. One independent psychologist recommended for M. C. only a small class size and large teacher-to-student ratio with *substantially separate* educational services based around a 1:1 Discrete Trial Training model (see *17). To the extent that M. C. has never received any Discrete Trial Training or other specialized instruction, M. C. need not be in a special school.

ii.  More recently, an independent psychologist recommended only that M. C. "requires placement in a full day, full year substantially separate placement specific to the needs of individuals with Intellectual Disabilities and Autism Spectrum Disorders" (see *40).

iii.  M. C. spends his entire school day in a Tradewinds classroom with only other disabled students, most of whom are non-verbal and some of whom have been, at times, residential students in the Tradewinds program.[97] Yet M. C.'s pediatrician would rather he "have opportunities to learn with their same-age peers with appropriate modification of the curriculum and the addition of supports in the general education classroom."[98]

iv.  M. C. spends his entire school day in a separate and segregated wing of the Tradewinds Education Center (TEC) in Rome, NY. Thus M. C. has little to no contact with non-disabled students in another wing of TEC and, even if he did, the

---

[97] M. C. is verbal and does not use assistive devices to communicate. He has always lived with his parents and in his community.

[98] Developmental Medicine Visit, Dr. Meredith Close, Director, Down Syndrome Program; Attending Physician, Division of Developmental Medicine, Boston Children's Hospital, 13 December 2023.

students without disabilities in this other wing are in preschool and are not age appropriate for M. C.

v.   M. C. has never participated in a field trip or any outing into the community as part of his school day at Tradewinds. In contrast, when M. C. was in an integrated education setting, he participated with his classmates in community trips to a local zoo, a public library, a local ice cream stand, a fruit orchard, and holiday concerts at the high school (see *8 and *8).[99]

vi.   The District itself applied M. C. to *three*, lesser-restrictive special education programs in 2022, one of which is specifically designed for students with Autism. This belies any argument that M. C. *must* be in Tradewinds.[100]

### M.C. is Inappropriately Placed in a Segregated Special School

54. Plaintiffs allege that UCP provides unqualified staff in M. C.'s classroom and this circumstance denies M. C. access to reasonable and necessary accommodations in the Tradewinds program.

i.   The private psychologist who evaluated M. C. in 2019 noted that M. C.'s classroom teacher must be certified in special education but should also have had

---

[99] Outside of school, M. C. has visited several major cities along the east coast. M. C. has even twice celebrated 4th of July on the National Mall in Washington, D. C., amidst tens of thousands of his fellow citizens, enjoying the benefits of being part of his community and watching fireworks.

[100] *In the matter of the Hearing between Parents of M.C. and The Clinton Central School District*, 13 July 2022, at line 19 (where the District states they would "apply [M. C] to three programs, one at OMH-BOCES, one at MO-BOCES, and one at OCM-BOCES").

substantial specific training and experience in the education of elementary school
children diagnosed with Autism and intellectual disabilities (see *17.ii).

    ii.    The person who has led M. C.'s classroom the longest, Ms. Kay Barnhart, holds a
Teacher Assistant Level III certification from the New York State Education
Department. One of M. C.'s other teachers at Tradewinds, Mr. Timothy Abone,
held a State certification as a baseball coach and did not last long. Parents assert
that persons with this level of certification are not qualified to provide educational
services to M. C.

    iii.    The reasonableness of providing qualified staff in M. C.'s classroom follows in
part from UCP's claim that "[a] primary emphasis of the Tradewinds program is
to provide a therapeutic environment for children," and that the Tradewinds
Education Center employs master's level specialists in the field of developmental
disabilities as well as special education teachers and therapists.

55. Plaintiffs allege that the Defendant's actions and omissions deny M. C. access to existing
*public* special education programs that would prevent the continued and unnecessary
segregation of our son in UCP's Tradewinds program. The Defendants continue to
discriminate against M. C. with deliberate indifference to Parents' repeated requests that
M. C. be placed in a more community-integrated educational setting.

    i.    Parents assert that placement into a *public* school and/or program along with non-
disabled students, or at least a program with a significant community-integration
component and substantive instructional and therapeutic services, is a plausible
and reasonable modification of his current program under the ADA and Section
504 of the Rehabilitation Act (see *8 and *8).

56. Plaintiffs allege that the Defendants intentionally discriminate against M. C. by denying him access to instructional services (e.g., teaching M. C. how to read, write, and do arithmetic) because of his intellectual and/or developmental disabilities. The Defendants continue to discriminate against M. C. with deliberate indifference to Parents' ardent advocacy and repeated requests that M. C. be given the opportunity to access certain instructional services.

    i.    Despite UCP's plan to perform an instructional evaluation of M. C. when he first entered the Tradewinds program, UCP did not complete this evaluation and concluded that M. C.'s "current skill lies – more in the 18-30 month skill level which wouldn't lend … to more traditional 'academic' IEP goals at this time" (see *24), thereby pointing to M. C.'s disability as the reason why he is denied access to academic instructional services.

    ii.    Furthermore, in formal meetings UCP's chief psychologist referred to M. C.'s low short-term memory scores to defend his assertion that M. C. will never learn to read for meaning (see *27), thereby pointing to M. C.'s disability as a reason why M. C. does not need access to reading instruction as an academic instructional service.

    iii.    The Defendants' position on instructional services for M. C. opposes that of a supervising psychologist at Boston Children's Hospital who noted that M. C. "requires intensive reading and applied academic skills in a one-to-one setting a minimum of one hour per day" (see *40.iv).

    iv.    The Defendants' position on instructional services for M. C. opposes that of M. C.'s pediatrician, who stated in her observation notes that "[i]t will be important

to continue to develop [M.C.'s] functional academic skills,"[101] and that "[i]t is also imperative that the continued development of [M.C.'s] reading skills be prioritized, as their [sic] reading capacity will have an impact on their vocational choices."[102]

v.     Finally, Defendants' position on instructional services for M. C. even opposes the conclusions of a private psycho-educational evaluation done in 2016, which states that M. C. "is demonstrably capable of learning to read, write and do math. His language comprehension and verbal and nonverbal reasoning skills are at sufficient levels that, when provided with appropriate instruction, repetition, accommodations and modifications, he is capable of learning grade-level academic skills."[103] At the time of this evaluation, M. C. was in kindergarten. Parents consequently assert that M. C. is capable of learning functional reading and numerical literacy at least at kindergarten level.

**M. C. Could be Educated in a More Integrated Environment**

57. Plaintiffs allege that Defendants intentionally discriminate against M. C. by maintaining him unnecessarily in a highly segregated educational setting when M. C. could be

---

[101] Developmental Medicine Visit, Dr. Meredith Close, Director, Down Syndrome Program; Attending Physician, Division of Developmental Medicine, Boston Children's Hospital, 13 December 2023.
[102] *Id.*
[103] Psychoeducational Evaluation, Dr. Sheila M. Clonan, Ph.D., NYS Licensed Psychologist; NYS Certified School Psychologist, July 2016.

educated in a more community-integrated environment with the services he should be receiving.

i.    Parents assert that there is nothing specialized in M. C.'s instructional, therapeutic, and behavioral support services that necessitates that he be in Tradewinds. Educational staff in practically any other special education setting has the requisite knowledge, skills, and training to provide comparable services to M. C., including staff in M. C.'s home school district and staff in a nearby educational cooperative (that has special education classrooms embedded in a typical school).

ii.    M. C. had access to certified special education teachers until he was placed into the Tradewinds program. Providing him access to a certified special education teacher in a more integrated setting has historically been readily achievable as opposed to providing one for him in the Tradewinds setting (see *8 and *8).

iii.    M. C. also had speech, physical, and occupational therapies for all the time he spent in community-integrated educational settings, starting with early intervention through to when he entered Tradewinds (see *8, *9, *14, and *15). Providing these therapies for him in a more integrated setting has historically been readily achievable as opposed to providing them in the Tradewinds setting. These therapies were delivered outside of M. C.'s classroom, rendering his classroom setting moot insofar as therapies are concerned.

iv.    A behavior intervention plan was also once successfully implemented in an integrated classroom by classroom staff, relying on no more than an outside behavioral consultant (see *10 and *11).

v.  A teacher assistant delivers most of M. C.'s current instructional services and these services are limited to teaching him life skills (e.g., tying shoes, folding laundry, cooking, etc.) without any substantive academic components (e.g., functional literacy in reading and math).

vi.  The Defendants have said repeatedly that M. C.'s placement is appropriate, implying that the instructional, therapeutic, and behavioral support services and accommodations that UCP Tradewinds provides M. C. is sufficient. If M. C. were to receive the same services at a similar level of delivery in a community-integrated setting, Parents assert that M. C. would be no worse off than he is now at Tradewinds and cannot be harmed any more than he already is now by placing him in a community-integrated setting with equivalent services and accommodation that he has now. The plus is that M. C. would be relieved of being segregated from non-disabled peers.

vii.  Parents assert that M. C. poses no more of a threat of harm or interruption to other students in a more community-integrated educational environment than he does while in Tradewinds. Parents argue that M. C.'s classmates have no less a right to their safety and education than non-disabled students in a general education setting. If M. C. presents a threat of harm or of disruption to non-disabled students and must, therefore, be segregated from non-disabled students, then M. C. must also be segregated from other disabled students for the same reasons – unless disabled students just do not matter. But M. C. is not segregated from non-disabled students.

viii.   Parents firmly assert that all the instructional, therapeutic, and behavioral support services and accommodations that UCP Tradewinds provided or currently provides to M. C. have been and could be even now readily delivered in a community-integrated setting. Currently, M. C. receives only one-on-one physical therapy and adaptive physical education. He is also receiving behavioral support *only* in the form of nominal behavioral intervention services.

**M. C. Receives Unequal Educational Opportunities in UCP's Tradewinds Program**

58. Plaintiffs allege that the Defendants intentionally discriminate against M. C. by denying him access to instructional services, differentiating M. C. from other (non-disabled *and* disabled) students who are in Clinton district schools, where M. C. would attend were it not for his disability and placement into the Tradewinds program. The Defendants continue to discriminate against M. C. with deliberate indifference to Parents' ardent advocacy and repeated requests that M. C. be given the opportunity to access certain instructional services.

   i.   Students with disabilities in the District's self-contained classrooms are taught academics. Certainly, when M. C. was briefly in a District self-contained classroom and even when he was homebound, he was taught basic functional academics (see *14); he had reading, writing, and math goals codified in his IEP.

   ii.  It goes almost without saying that most non-disabled students in Clinton school district have access to basic instruction.

iii.  Parents assert the Defendants' inaction to address this differential treatment of M. C. reflects the Defendants' deliberate indifference to M. C.'s circumstances.

59. Plaintiffs allege that Defendants intentionally discriminate against M. C. by denying him access to instructional services, differentiating M. C. from other students who receive these instructional services *in Tradewinds* and in other education-based programs under UCP's umbrella. The Defendants continue to discriminate against M. C. with deliberate indifference to Parents' ardent advocacy and repeated requests that M. C. be given the opportunity to access certain instructional services.

i.  UCP's Executive Vice President of Educational Services makes clear that Tradewinds staff "work on these [functional academic] skills with many of our students who have the prerequisite skills to work on such goals" (see *25). Consequently, M. C. is differentiated from these many other Tradewinds students in that he is denied the opportunity to be taught functional academic skills.

ii.  UCP runs a New York State certified pre-school program for children with and without disabilities, which has classrooms in the same building that M. C. attends school in. In fact, M. C. was once a student in this pre-school program, and he most certainly received instruction in pre-academics just as his peers did. Consequently M. C. is even differentiated from UCP pre-school students in that he is denied the opportunity to engage substantively in being taught academic skills.

iii.  Parents assert the Defendants' inaction to address this differential treatment of M. C. reflects Defendants' deliberate indifference to M. C.'s circumstances.

60. Plaintiffs allege that the Defendants intentionally discriminate against M. C. by denying him access to reasonable "therapeutic" services (e.g., speech and occupational therapies), differentiating M. C. from other special education students who are in Clinton district schools.

    i.    These therapeutic services are in M. C.'s Individual Educational Program (IEP) and have been in his IEP since he started kindergarten; M. C.'s IEP is presumably a legally binding document.[104] As such, the District delivered these services from the fall of 2019 until M. C. entered UCP's Tradewinds program. The District even charged these services in whole or in part to the New York State Medicaid School Supportive Health Services Program. Parents contend that it is highly likely that other District students with a disability receive such therapeutic services even though M. C. no longer receives some of them by virtue of his placement in Tradewinds.

    ii.    Parents notified the District in October 2023 that they "received UCP's letter about potential reductions in PT/OT/speech therapy service[s] due to their staffing shortages. Absolutely not."[105] – indicating Parents' objection to the lack of speech therapy services. Parents also noted that they "don't care who [M. C.'s] therapists work for,"[106] suggesting that any staffing shortages should be addressed by whatever means the District has at its disposal. Parents were not notified that M.

---

[104] Parents do not have IEP updates beyond 13 October 2023 and do not know if any such updates exist.

[105] Email correspondence from Parents to the District after receiving UCP's 13 October 2023 letter about the loss of speech therapists, 30 October 2023.

[106] *Id.*

C.'s occupational therapy was suspended when his occupational therapist quit in May 2024.

    iii.    Parents assert the Defendants' inaction to address the loss of M. C.'s therapies reflects Defendants' deliberate indifference to M. C.'s circumstances.

### M. C. Lacks Appropriate Services in UCP's Tradewinds Program

61. Plaintiffs allege the Defendants intentionally discriminate against M. C. by denying him speech and occupational therapy services, which afford M. C. reasonable accommodation to allow him to participate in and access educational opportunities at school and life activities beyond his school. They continue to do so with deliberate indifference to the Parents' expressed insistence that M. C.'s speech therapy services continue.[107]

    i.    Parents assert that Tradewinds' "therapeutic environment" is anything but therapeutic for M. C., and Tradewinds has not been substantively therapeutic for M. C. since he entered Tradewinds in 2019.

    ii.    M. C. had speech and occupational therapy services since he was a toddler in early intervention. Staffing issues at Tradewinds are the reason why these therapy services were suspended / terminated (see *29 and *41). The Clinton district has a responsibility for continuity of these services but the District has done next to nothing to compensate for the loss of services.

---

[107] Parents did not ask for M. C.'s occupational therapy services to continue because doing so would be futile.

    iii.    M. C.'s latest neuro-psychological evaluation requires that he receive "*intensive* occupational therapy, physical therapy ... instruction," and that speech therapy services be delivered "in a one-to-one and group setting" (see *40.iii). Parents are unaware of any evaluations or assessments that state M. C. no longer needs these therapies.

    iv.    Parents assert the Defendants' inaction to address the loss of services to M. C. reflects the Defendants' deliberate indifference to M. C.'s circumstances.

62. Plaintiffs allege the Defendants intentionally discriminate against M. C. by denying him reasonably sufficient one-on-one direct educational services and/or one-on-one Applied Behavioral Analysis therapy services designed to help M. C. access his educational opportunities and even address his behavioral challenges. This failure contributes to Plaintiffs' claims that the Defendants discriminated against M. C. with deliberate indifference to his need for reasonable and critical accommodation.

    i.    Two independent psychologists have recommended substantial behavioral services for M. C. to help M. C. generalize and maintain behavioral and social skills, establish compliance and imitative behaviors needed for classroom instruction, acquire basic adaptive skills, and improve joint attention skills (see *40.ii). Yet the Defendants seem to ignore the opinions of other professionals without addressing the lack of sufficient accommodating services in M. C.'s program. This inaction constitutes deliberate indifference.

    ii.    UCP has vigorously argued against providing certain instructional services to M. C., particularly services that teach functional academics. UCP squarely points to M. C.'s disability as a reason for denying the services (see *24 and *27).

iii. Even though the District has provided a reading tutor for M. C. since October 2022,[108] the service is limited as an effective accommodation. In fact, the reading tutor proposed that if M. C. "had an hour and a half to two hours of devoted instruction to reading that [M. C.] might be more engaged."[109] Additionally, an independent psychologist recently recommended that M. C. receive *intensive* reading instruction for a minimum of one hour per day (see *40.iv).

iv. Even though Parent requested that a brief report from M. C.'s tutor be included in M. C.'s quarterly report cards, such a report has been included only once since the tutoring began,[110] and Parents are not generally given updates on the tutoring in any venue unless they specifically request a meeting with the tutor. Contrast this with the fact that every report card includes a distinct report about M. C.'s behavioral metrics. This suggests that some information about M. C.'s engagement of his tutoring sessions is not being provided, constituting deliberate indifference.

v. Moreover, M. C. is not provided substantive instruction in arithmetic and writing/typing. Parents have also advocated for instructional services and filed a complaint about the lack of such services. Yet the Defendants seem to ignore all the feedback without tackling the mounting issues with M. C.'s program, and this inaction constitutes deliberate indifference.

---

[108] *In the matter of the Hearing between Parents of M.C. and The Clinton Central School District*, 13 July 2022, at line 21 (where the District agreed to "secure a special education tutor to provide tutoring for [M. C] at UCP three times a week for 45 minutes for the 2022/23 school year while [M. C.] remains at UCP.").

[109] Clinton Central School District CSE meeting notes, 23 April 2023.

[110] Tradewinds report cards for M. C. consistently included distinct reports for M. C.'s other services (i.e., therapies, behavioral support, and adaptive physical education).

63. Plaintiffs allege the Defendants intentionally discriminated against M. C. by denying him reasonably sufficient behavior intervention services designed to help M. C. address his behavioral challenges now and into the future. This failure contributes to Plaintiffs' claim that the Defendants discriminated against M. C. with deliberate indifference to his need for reasonable and critical accommodation.

    i. Prior to 2019, the District provided no behavioral services while M. C. was homebound and relied on Parents' private provision of such services through Upstate University Hospital (see *14). The District and UCP knew very well that M. C. needs support and specialized services to address his behavioral challenges (see *15, *16 and *17.iv), and yet they failed to act expeditiously in M. C.'s interests despite that knowledge.

    ii. In 2019, the District emphasized M.C.'s "intense" behavioral challenges as the primary reason for placement into UCP Tradewinds (see *15 and *17.iv), and then argued weeks later that his "[b]ehaviors have improved" and that the UCP's senior behavior analyst "doesn't feel [M. C.] needs an FBA/BIP" (see *22). UCP's senior behavior analyst presented data during a program review and claimed that M. C.'s behaviors during Tradewinds' initial evaluation of him were minimal (where a "[g]raph was handed out to show behaviors" (see *22).

    iii. However, Tradewinds educational staff for several months documented frequent examples of the behavior that landed M. C. in Tradewinds to begin with – including the period that the UCP's senior behavior analyst reported on.[111] Parents assert that UCP's behavior analyst was either incompetent or believed that M. C.'s behavioral

---

[111] Parents retain the original copy of the daily logs.

challenges were unworthy of being addressed directly, thereby affording M. C. no means and opportunity to ever exit the Tradewinds program.

    iv.  The Defendants forestalled until 2021 the performance of a functional behavior assessment of M. C. and creation of a behavior plan, but only after Parents called the District and UCP out on their failure in April 2020 and indicated a due process complaint.

64. Plaintiffs allege the Defendants intentionally discriminate against M. C. by denying him plausible and reasonable accommodations to address his behavioral challenges, thereby contributing to M.C.'s continued and unnecessary segregation in UCP's Tradewinds Education Center, with deliberate indifference to the Parents' repeated and expressed concern that M. C.'s behaviors would deny their son access to educational opportunities and access to community-integrated educational environments.

    i.  Parents' assert that neither the District nor UCP have provided reasonable and necessary behavioral services to address M. C.'s behavioral challenges, which Defendants themselves have argued are a limiting consideration in M. C.'s educational opportunities.

    ii.  The Defendants seem to ignore the opinions of other professionals without addressing the lack of sufficient accommodating services in M. C.'s program, and this inaction constitutes deliberate indifference.

**Defendants Interfered with and Denied Plaintiff's Right to**

**Exercise Independent Educational Evaluations of M. C.**

65. Plaintiffs allege the Defendants interfered with and delayed execution of Parents' substantive rights under the IDEA to independent evaluations/assessments of M. C. in violation of Title II of the ADA and Section 504 by:

    i.   Insisting that "[t]he District's position remains that there is no right to an IEE for an FBA as an FBA is not an evaluation,"[112] despite the formal agreement the District made with Parents in 2022 to a triennial re-evaluation of M. C. that would "include a behavioral assessment,"[113] and offering that "[t]he aforementioned reevaluation, if parents disagree with it, they can request an IEE, an independent educational evaluation, and Clinton will grant that request."[114]

    ii.   Even when the matter of the independent evaluations/assessments of M. C. was settled to avoid a due process hearing, the District: a) refused to "allow observations across multiple settings"[115] in support of the FBA, causing Parents' independent evaluators "to postpone the FBA until an agreement can be reached;"[116] b) refused to "come to agreement on a reasonable cost for this [functional behavior] evaluation; c) was "unwilling to provide [Parents' independent evaluator] access to Clinton Central Schools,"[117] because "access to

---

[112] Email correspondence from Elizabeth Dougherty, Clinton Central School District, to Parents, 01 November 2023 (as part of an extended email conversation about Parents' request for IEEs).
[113] In the matter of the Hearing between Parents of M.C. -and- The Clinton Central School District, July 13, 2022. Page 16, lines 9-17.
[114] *Id.* Page 17, lines 14-17.
[115] Email correspondence from Dr. Jenna Rufo, empowered School Solutions, to the Clinton Central School District, 02 May 2024 ("writing to address points related to the FBA and inclusion assessment" for M. C. because Dr. Rufo was "unable to resolve these issues directly with the district.").
[116] *Id.*
[117] *Id.*

the inclusive environment, which, by nature is part of the [inclusion] assessment, was denied;"[118] and d) refused to help Parents initiate and socialize the coordination of school-based observations with UCP and one of the District's own contractors, insisting that "[y]ou and your team are going to have to set this up with UCP directly, they are waiting to hear from you. It is your team's responsibility to set it up and coordinate."[119]

    iii.    Parents assert that evaluation and/or assessment by the Defendants' educational and treatment professionals is only one means to determine whether a more integrated educational setting is reasonable and readily achievable for M. C.

66. Plaintiffs allege Defendants intentionally discriminated against Plaintiffs by interfering with their right to exercise independent educational evaluations of M. C. in violation of Title II of the ADA and Section 504 by:

    i.    Thwarting timely execution of an inclusion assessment of M. C. whose purposes are to a) consider whether/how he could be educated in a more integrated setting in accordance with the ADA's integration mandate; b) what additional accommodations he might need to enjoy the benefits of a more integrated setting; and c) what accommodations he might need to better engage his reading and other instructional services.

---

[118] *Id.*

[119] Email correspondence from Elizabeth Dougherty, Clinton Central School District, to Parents, 19 April 2024 (responding to Parents' request for "Tradewinds points of contact more formally" and suggesting "it might be better for [the District] to tell [Parent] that it's OK for [Parent] to pass along the information to Dr. Rudo's [sic] team," and "to make sure that we're all on the same page." ).

ii.   Thwarting timely execution of a comprehensive functional behavior assessment of M. C. whose purposes are to a) consider whether/how he could be educated in a more integrated setting in accordance with the ADA's integration mandate; b) what additional accommodations he might need to enjoy the benefits of a more integrated setting; and c) what accommodations he might need to better engage his reading and other instructional services.

iii.  Harassing the Plaintiffs and their educational consultant firm to the point where their efforts to plan for and arrange the independent evaluations of M. C. were derailed (see *33, *34, *35, *36, *37, and *38). As a direct consequence, the Plaintiffs incurred and paid nearly $2,900 in labor costs owed to the educational consultant firm for their initial preparation and for having "spent a significant amount of time on the phone, engaging in emails with various contacts at the district and Tradewinds, and completing documentation required by Tradewinds to permit us access."[120]

iv.   Parents' consultant was needlessly harassed and exasperated to the point where they noted that "[o]ver the past four years, Empower ED has provided special education supports to both school districts and families in sixteen states and in Australia. We have never experienced this level of difficulty scheduling with a district and are quite frankly, flabbergasted at the hoops we have been required to jump through to perform a few simple evaluations."[121]

---

[120] Email correspondence from Dr. Rufo, CEO of Empower ED School Solutions, to the Clinton school district, 02 May 2024.
[121] *Id.*

v.  Even after Plaintiffs sent a Notice of Intent to file this lawsuit, Defendants did not
address some of the remaining disagreements regarding the independent
educational evaluations. Of the FBA, the District insisted that "[they] have
determined that the market rate cost is $2,550.00"[122] and that "the District
remains committed to this amount and will provide payment upon receipt of the
corresponding IEE reports,"[123] even though Empower ED School Solutions stated
the cost to be about $4,500. The District did not even acknowledge the costs that
Plaintiffs paid to settle the waste of Empower ED's time in May 2024.

vi.  In response to Plaintiff's Notice of Intent to file this lawsuit, UCP's attorney
continued to insist that "[her] client intends to be cooperative in the IEE process
and agrees to participate in the psychoeducational evaluation and FBA, *but needs
more information regarding the inclusion evaluation.*"[124] Parents replied that they
"honestly don't understand what Dr. Rufo did not address in the [May 2024]
response to [UCP's] five questions about the inclusion assessment,"[125] and offered
that UCP was "more than welcome to list the specific questions [UCP] want[s]
clarification on."[126] In a final follow up, UCP claimed that they "missed the
attached document from Dr. Rufo in reviewing our previous communications,"[127]
and agreed to allowing school observation the inclusion assessment; however,

---

[122] Email correspondence from the Clinton school district to Empower ED School Solutions, 10
September 2024 (acknowledging Plaintiffs' Notice of Intent to File a Lawsuit).
[123] *Id.*
[124] Memo from Anne McGinnis to Parents regarding Upstate Caring Partners/Response to
September 9, 2024 Letter, 12 September 2024. Italics added for emphasis.
[125] Email correspondence from Parents to Anne McGinnis, 13 September 2024 (following up on
UCP's response to Plaintiff's Notice of Intent).
[126] *Id.*
[127] Email correspondence from UCP's attorney, Anne McGinnis, to Parents, 16 September 2024.

UCP added the condition that "any consultation/discussion with staff to occur either before or after school so students are not present and instruction is not interrupted."[128]

vii.    Parents are skeptical of UCP's claim that the information UCP demanded in May 2024 about the inclusion assessment was overlooked, as that information was provided in tabular format and literally next to and between the answers to the questions about the psycho-educational evaluation and functional behavior assessment, which UCP agreed to allow back in May 2024.

viii.    Parents assert that UCP had no basis for inquiring about the purpose and content of the independent evaluations to begin with, other than to establish the evaluators would comport with Tradewinds' general visitor policy and that they were requesting reasonable access to Tradewinds staff. Nor did UCP have the *option* to cooperate with the independent evaluations and assessments. Indeed, a state review officer offered that "Tradewinds is a State-approved nonpublic school and, therefore, must 'conform[] with the requirements of Federal and State laws and regulations governing the education of students with disabilities' (8 NYCRR 200.1 see 8 NYCRR 200.7), and, among those requirements, is the parents right to obtain an IEE (see 20 U.S.C. 34 CFR 300.502; 8 NYCRR 200.5[g])."[129]

ix.    Parents assert that we are stuck with Tradewinds as the setting in which these evaluations and assessments are done because M. C. does *not* readily generalize

---

[128] *Id.*
[129] *Application of a STUDENT WITH A DISABILITY, by his parents, for review of a determination of a hearing officer relating to the provision of educational services by the Board of Education of the Clinton Central School District*, No. 24-189, 15 July 2024.

and adapt to unexpected changes in his setting, and conducting school observations of M. C. elsewhere would undermine the validity of the results.[130] Sadly, this constraint reflects Defendants' failure to provide the ABA therapy that M. C. needs to learn how to tolerate change (see *17.iii and *40.i).

x.    Parents assert that the Defendants' actions and/or omissions continues to have a disparate impact on the Parents' ability to plan for, coordinate, and carry out the independent evaluations and assessments of M. C., as agreed to by the District and memorialized in an ORDER issued by a New York State Education Department impartial hearing officer (see *32). This has the effect of indefinitely leaving M. C. in a highly segregated program when his placement into a more integrated setting and/or program is plausible and reasonable.

### Defendants' Methods of Administration

67. Plaintiffs allege Defendants intentionally discriminated against Plaintiffs by applying methods of administration which caused disparate impact on Plaintiff's ability to advocate for accommodation and services for M. C., in violation of Section 504:

i.    Parents assert that UCP leadership essentially argued against functional literacy instructional services for M. C. as a strategy to avoid presumed litigation in the future (see *27). This had the immediate effect of interfering with Parents' right to

---

[130] Parents note that two of the assessments have observation components beyond Tradewinds, but this is by design; all three independent evaluations and assessments have a school-based observation component.

advocate for M. C. and shut down good faith discussion about all instructional services for M. C. Furthermore, UCP's stance intended to preclude a service for M. C. that UCP asserted would ultimately lead to litigation. Specifically, UCP's senior behavior analyst wrote that she was "hesitant" to add reading goals because she expected [M. C.] would fail to achieve under Parents' proposed instructional services, and this failure would consequently land UCP in "litigation space" (see, again, *27).[131] If this line or reasoning is allowed to stand unchallenged, the Court would effectively green-light a workaround to providing reasonable accommodation and services, leaving individuals with disabilities without remedy. Indeed, UCP has not provided the instructional services that Parents advocated for to this day.

ii.  Parents assert that UCP expressed more than simply frustration or benign musing about their stance on instructional services for M. C. Parents contend that the October 2021 email from UCP's Executive Vice President of Educational Services makes clear UCP's belief that they had "to take a strong stance as to the type of program that we [Tradewinds] are to prevent a lawsuit from this family down the road" (see *27). This feedback to the District had the effect of defeating the New York State Education Department's objective to deliver educational services to students with a disability.

---

[131] The reference to litigation follows a complaint about UCP that Parents filed with the New York State Education Department one month earlier, in July 2021.

# CAUSES OF ACTION

## Count I

### Violation of Americans with Disabilities Act

### (42 U.S.C. § 12101, et seq.)

68. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

69. The Plaintiffs allege the Defendants intentionally discriminates against M. C. through the acts and omissions described in this complaint, in violation of the integration mandate under the ADA by:

     i.    Needlessly segregating M. C. in Upstate Cerebral Palsy's Tradewinds program, when he could be readily educated in a more integrated setting with plausible and reasonable accommodations and services.

     ii.   Failing to provide M. C. with necessary and reasonable accommodation and services when this failure leads to the continued and unnecessary segregation of M. C. in Upstate Cerebral Palsy's Tradewinds Education Center.

70. The Plaintiffs allege the Defendants fail to provide necessary and reasonable accommodation and services for M. C. through the acts and omissions described in this complaint, and this failure leads to the denial of equal educational opportunities for M. C. in violation of Title II of the ADA by:

    i.   Denying M. C. the opportunity to participate in and benefit from instructional services that are afforded other students within the Clinton Central School District, and even other students in UCP's Tradewinds program;

    ii.   Denying the M. C. services that are necessary to help him gain meaningful benefit from substantive educational opportunities afforded other students within the Clinton Central School District, and even other students in UCP's Tradewinds program;

    iii.   Denying M. C. the opportunity to receive educational programs and services in the most integrated setting for his needs; and

    iv.   Denying M. C. the reasonable modifications to the Defendants' policies, practices, and procedures governing the provision of services they need to avoid discrimination.

71. The Plaintiffs allege the Defendants discriminated against the Plaintiffs by interfering in Plaintiffs' exercise of their ardent advocacy for M. C.'s right to be free from discrimination, in violation of Title II of the ADA by:

    i.   Thwarting timely execution of an inclusion assessment of M. C. whose purposes are to a) consider whether/how he could be educated in a more integrated setting in accordance with the ADA's integration mandate; b) what additional accommodations he might need to enjoy the benefits of a more integrated setting; and c) what accommodations he might need to better engage his reading and other instructional services.

    ii.   Thwarting timely execution of a comprehensive functional behavior assessment of M. C. whose purposes are to a) consider whether/how he could be educated in

a more integrated setting in accordance with the ADA's integration mandate; b) what additional accommodations he might need to enjoy the benefits of a more integrated setting; and c) what accommodations he might need to better engage his reading and other instructional services.

 iii. Harassing the Plaintiffs and their educational consultant firm to the point where their efforts to plan for and arrange the independent evaluations of M. C. were derailed. As a direct consequence, the Plaintiffs incurred and paid nearly $2,900 in labor costs owed to the educational consultant firm simply because the firm tried to do their job.

## Count II

### Violation of Section 504 of the Rehabilitation Act of 1973

### (29 U.S.C. § 794)

72. Plaintiffs incorporate by reference each and every allegation contained in the foregoing paragraphs as if specifically alleged herein.

73. The Plaintiffs furthermore allege the Defendants fail to provide the accommodation and services through the acts and omissions described in this complaint, in violation of Section 504 by:

 i. Needlessly segregating M. C. in Upstate Cerebral Palsy's program when he could be readily educated in a more integrated setting with plausible and reasonable accommodations and services.

    ii.    Denying M. C. the opportunity to participate in and benefit from substantive educational services that are afforded other students within the Clinton Central School District, and even other students in UCP's Tradewinds program;

    iii.    Denying the M. C. services that are necessary to help him derive meaningful benefit from substantive educational opportunities afforded other students within the Clinton Central School District, and even other students in UCP's Tradewinds program;

    iv.    Denying M. C. the opportunity to derive reasonable benefit from his education in an achievable integrated setting;

    v.    Denying M. C. the reasonable modifications to their policies, practices, and procedures governing the provision of services they need to avoid discrimination; and

    vi.    Utilizing methods of administration that have the effect of defeating or substantially impairing the accomplishment of the objectives of the New York State Education Department's special education programs with respect to M. C.

74. The Plaintiffs allege the Defendants discriminated against the Plaintiffs by interfering in Plaintiffs' exercise of their ardent advocacy for M. C.'s right to be free from discrimination, in violation of Section 504 by:

    i.    Thwarting timely execution of an inclusion assessment of M. C. whose purposes are to a) consider whether/how he could be educated in a more integrated setting in accordance with the ADA's integration mandate; b) what additional accommodations he might need to enjoy the benefits of a more integrated setting;

and c) what accommodations he might need to better engage his reading and other

instructional services.

ii.   Thwarting timely execution of a comprehensive functional behavior assessment

of M. C. whose purposes are to a) consider whether/how he could be educated in

a more integrated setting in accordance with the ADA's integration mandate; b)

what additional accommodations he might need to enjoy the benefits of a more

integrated setting; and c) what accommodations he might need to better engage

his reading and other instructional services.

iii.   Harassing the Plaintiffs and their educational consultant firm to the point where

Defendants derailed their efforts to plan for and arrange the independent

evaluations of M. C. As a direct consequence, the Plaintiffs incurred and paid

nearly $3,000 in labor costs owed to the educational consultant firm.

75. The Plaintiffs allege Defendants the interfered with Plaintiffs' right to exercise

independent educational evaluations of M. C., as afforded by the IDEA by:

i.   Questioning the planned scope of an independent functional behavior assessment

to include observations of M. C. at home and in his community, when case law

makes clear that the reasonable scope of an IEE cannot be abridged. This action

effectively served to undermine the value of the assessment in determining

whether M. C. can be more integrated with his community.

ii.   Requiring Plaintiffs to explain the *purpose* of an inclusion assessment as a

condition to allowing Plaintiffs' evaluator to conduct said assessment at the

Tradewinds Education Center. The purpose of any IEE is clear by statue and case

law, and Plaintiffs had already addressed a set of five questions regarding this

assessment – including directing UCP to the educational consultant's website for information about the inclusion assessment. This action effectively served to delay execution of and undermine the value of the assessment in determining whether M. C. can be more integrated with his community.

iii.   Unilaterally deciding the terms of the independent evaluations, such as initially declaring that Plaintiffs' evaluators were unwelcome to observe District facilities as part of the inclusion assessment, and stubbornly insisting that *they* have determined that the market rate cost of an independent functional behavior assessment, effectively delaying execution of and undermining the value of these assessments in determining whether M. C. can be more integrated with his community.

## **PRAYER FOR RELIEF**

Pursuant to 42 U.S.C. § 12133, the Plaintiffs are entitled to declaratory and injunctive relief as under 42 U.S.C. § 12205.

Wherefore, Plaintiffs request that this Court grant the following relief:

i.   Order the Clinton Central School District and Upstate Cerebral Palsy to comply without further delay and interference with the spirit and letter of the District's agreement with Parents regarding Parents' requested independent educational evaluations/assessments, as memorialized in an administrative hearing officer's ORDER issued in April 2024;

ii.  Order the Clinton Central School District to pay the market rate of about $4,500 for the independent functional behavior assessment;

iii.  Appoint an independent administrator to monitor that the coordination and execution of any and all reasonable requests by Parents' chosen independent evaluators, including visits to Clinton Central School District facilities and/or UCP's Tradewinds Education Center as part of these evaluations, are performed without harassment of the evaluators, and without conditions that limit the scope and/or effectiveness of the evaluations/assessments;

iv.  Declare that the Defendants' discriminatory conduct as alleged herein violates the ADA and Section 504 of the Rehabilitation Act;

v.  Permanently enjoin Defendants from violating the ADA and Section 504 of the Rehabilitation Act insofar as the Plaintiffs are concerned;

vi.  Retain jurisdiction of this case until Defendants have complied with the orders of this Court and until there is a reasonable assurance that Defendants will comply near term and continue to comply in the future absent continuing jurisdiction;

vii.  Award Plaintiffs compensatory damages of $1.5 million and an additional $300,000 for each year that M. C. remains in a segregated educational setting so that Parents can execute an educational program for M. C. that provides him with a modicum of meaningful benefit and some semblance of integration with his community;

     viii. Award Plaintiffs' costs including the amount already paid to the chosen

        educational consultant for preparing for the independent educational

        evaluations, as provided by statute and law; and

     ix. Award any such other relief as the Court finds just and proper.

We declare under penalty of perjury that the foregoing is true and correct to the best of our knowledge and belief.

DATED: 11 October 2024

Michael Carpenter, *pro se*                     Signature: _____

⌼ PO Box 87, Clark Mills, NY 13321

☏ 315.796.3516

✉ michael.carpenter.nil@gmail.com

Dawn Carpenter, *pro se*                     Signature: _____

⌼ PO Box 87, Clark Mills, NY 13321

☏ 315.796.3517

✉ djtk65@aol.com